**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------X

KAYLEEN HENDERSON,

                   Plaintiff,                  **OPINION & ORDER**

     -against-                       16 Civ. 5458 (PED)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                 Defendant.

-------------------------------------------------------X

## I.    INTRODUCTION

Plaintiff Kayleen Tolan Henderson ("Plaintiff," or "Claimant,") brings this action

pursuant to 42 U.S.C. § 405(g) challenging the decision of the Commissioner of Social Security

("Defendant" or the "Commissioner") denying Plaintiff's application for disability insurance

benefits.  The matter is before me pursuant to a Notice, Consent and Reference of a Civil Action

to a Magistrate Judge entered August 8, 2016.  Dkt. 12.  Presently before this Court are

Defendant's motion for remand and Plaintiff's cross motion for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Dkts. 15 (Plaintiff's motion), 16

(Plaintiff's memorandum of law), 17 (Defendant's cross motion), 18 (Defendant's memorandum

of law in support), and 19 (Plaintiff's reply).

For the reasons set forth below, Defendant's motion is **GRANTED,** and Plaintiff's

motion is **DENIED**.

## II. BACKGROUND

The record contains over six hundred pages of medical records which are summarized here to the extent they are germane. The following facts are taken from the administrative record ("R.") of the Social Security Administration. Dkt. 14.

### A. Application History

On April 22, 2013, Plaintiff filed a Title II application for a period of disability and disability insurance benefits alleging disability beginning on August 6, 2012. R. 151-54. Her application was denied initially on August 28, 2013. R. 88-93. Plaintiff timely requested a hearing before an ALJ on September 9, 2013. R. 95. Plaintiff appeared before ALJ Robert A. Gonzalez represented by counsel, Scott Goldstein, on January 9, 2015. R. 35-72. On March 12, 2015, the ALJ issued an unfavorable decision. R. 11-13. The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review on May 12, 2016. R. 1-4. Plaintiff timely filed this action on July 8, 2016. Dkt. 1.

Plaintiff was born on February 26, 1970. R. 151. She was 44 years old at the time of her administrative hearing. R. 39. Plaintiff graduated from high school in 1988. R. 176. Plaintiff had past work experience as a food service worker, a cleaning crew member, bus aide, and day care supervisor. R. 41-43, 45-46. In her application for disability insurance, Plaintiff alleged that she had been disabled since August 6, 2012 (the "Alleged Disability Onset Date") due to an unidentified work related injury. R. 44-45, 48-59, 174-76.

### B. Medical History

#### 1. Dr. Herbert Garcia

From August 12 through November 16, 2012, Dr. Herbert Garcia, an osteopath, treated Plaintiff's mid-back and thoracic pain and spasms with trigger point injections and osteopathic

2

manipulative therapy. R. 290-92, 295-96, 298-308, 309-17. Dr. Garcia evaluated Plaintiff on August 22, 2012 and assessed she had a 12% whole person impairment rating that was based upon a 10% impairment of Plaintiff's left arm, which in turn consisted of a 4% impairment of her left shoulder and 6% impairment of her thoracic spine. R. 252-72, 312. In a November 9, 2012 assessment, Dr. Garcia assessed she had a 22% whole person impairment rating based on a 30% impairment of the left arm, including a 3% impairment of the left shoulder, a 22% impairment of the left hand, and a 5% impairment of the thoracic spine region. R. 417-33. Notably, Dr. Garcia's November 16, 2012 Workers' Compensation Form reported that Plaintiff was 100% temporarily impaired. R. 410-11.

### 2. Dr. John Handago

From August 27, 2012 through October 7, 2014, Dr. John Handago, an orthopedic surgeon, regularly saw Plaintiff, initially, for her cervical spine and left shoulder complaints, but beginning in May 2013, solely for her cervical complaints. R. 361-71, 492-548, 632-35. On August 27, 2012, Dr. Handago's examination of Plaintiff revealed that she had diminished range of motion, spasm, tenderness of the cervical spine, but that Plaintiff's upper extremities reflexes, and motor and sensory functions were intact. R. 367. Dr. Handago found that Plaintiff had a positive impingement, rotator cuff, and supraspinatus signs at the left shoulder, and a positive O'Brien sign.[1] R. 367.

From October 1, 2012 through March 26, 2013, Dr. Handago continued to report that Plaintiff had tenderness to palpation, diminished range of motion, and spasm in the cervical spine

---

[1]     The O'Brien Test is an orthopedic test for the shoulder that attempts to test specifically for joint labral tears. Magnus Arnander and Duncan Tennent, "Clinical Assessment of the Glenoid Labrum" (August 13, 2014). Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4935037/

and diminished and painful range of motion, and positive impingement, supraspinatus (small muscle in the upper back) and rotator cuff signs in the left shoulder. A cervical compression test was positive. R. 365-66. Plaintiff's reflexes varied. R. 365-66. During this period, a November 9, 2012 MRI of Plantiff's left shoulder came back normal and Plaintiff's tendinosis (chronic tendinitis) noted in her September 5, 2012 study had resolved. R. 319. In February and March 2013, Dr. Handago ordered an electromyography/nerve conduction study ("EMG/NCS") of Plaintiff's upper extremities and recommended that Plaintiff pursue physical therapy. R. 365-66.

In March 2013, Dr. Handago diagnosed Plaintiff with cervical herniated nucleus pulposus,[2] and he variously diagnosed left shoulder tendinosis or left shoulder impingement. R. 365-66.

From May through October 2013, Plaintiff's examination results were consistent but her reflex results varied. R. 539, 542, 545, 548. From December 2013 through October 7, 2014, Plaintiff showed a diminished range of motion and spasm in the cervical spine, and tenderness to palpation on occasion with varied reflexes. R. 524, 527, 530, 533, 536. During this period, a June 23, 2014 MRI of her cervical spine showed a stable disc bulge without stenosis at the levels of C2-C3 and C5-C6, and no disc bulge, herniation or stenosis (abnormal narrowing) at the remaining levels C3 through T1. R. 493. There was no significant change from the September 26, 2012 MRI taken two years earlier. R. 493. There was, however, straightening of the cervical lordosis (inward curve as opposed to normal outward) that may have resulted in her muscle

---

[2]      Herniated nucleus pulposus is a condition in which part or all of the soft, gelatinous central portion of an intervertebral disk is forced through a weakened part of the disk, resulting in back pain and nerve root irritation. Mark R Foster, MD, PhD, FACS, "Herniated Nucleus Pulposus," (Feb. 3, 2017). Available at https://emedicine.medscape.com/article/1263961-overview

spasms. R. 494. During this period, Dr. Handago routinely completed Workers' Compensation Doctor's Progress Reports indicating that Plaintiff had a "100%" disability and that she could not return to work due to a cervical herniated nucleus pulposus. R. 522-23, 525-26, 528-29, 531-32, 534-35, 537-38, 540-41, 543-44, 546-47. On July 17, 2014, Dr. Handago completed a Workers' Compensation Maximum Medical Improvement/Permanent Impairment Report opining that Plaintiff could occasionally lift/carry and push/pull 10 pounds; frequently sit, stand, walk, kneel, and bend/stoop/squat; occasionally perform simple grasping, fine manipulation, and reaching at or below shoulder level, and drive a vehicle; and never climb, reach overhead, operate machinery, or tolerate temperature extremes or high humidity. R. 634. In this report, Dr. Handago also found that Plaintiff could perform "sedentary work," including exerting up to 10 pounds of force occasionally and negligible amounts of force frequently to lift, carry, push and pull, sitting most of the time, with walking and standing required only occasionally. R. 632-35.

Dr. Handago's December 30, 2014 Work Capacity Evaluation Report diagnosed Plaintiff with chronic cervical strain and cervicalgia (neck pain) and noted that the MRI findings revealed no herniation and the EMG/NCV findings revealed no radiculopathy. R. 646. He noted that Plaintiff had a poor response to medication, pain management, and physical therapy. R. 646. In his report, Dr. Handago opined that Plaintiff could not lift even five pounds, sit for only four hours, stand and/or walk two hours, and would have to be able to shift position at will in an eight hour workday. R. 647. She could use her hands to grasp, do fine manipulation, feel, reach, and push/pull on a "regular basis." R. 648. Dr. Handago further opined that Plaintiff could use her feet and legs to push and pull on a "regular basis," occasionally crawl, twist, squat/crouch, bend/stoop, and climb stairs, and could never climb ladders. R. 648.

### 3. Dr. Neal Dunkelman

From November 20, 2012 through November 19, 2014, Dr. Neal Dunkelman, a physical medicine and rehabilitation specialist, saw Plaintiff for complaints of neck, upper back and left shoulder pain. R. 480-405, 434-50, 475-77, 489-92, 550-84, 586-624, 643-45. Dr. Dunkelman reported that Plaintiff's left shoulder was tender to palpation, tenderness and spasm in the paracervical, upper trapezius, and periscapular regions, restricted ranges of motion of the cervical spine and left shoulder, sensory intact, and symmetrical deep tendon reflexes. R. 405. Dr. Dunkelman's motor examination revealed weakness in her left shoulder, but normal motor tone, and no atrophy. R. 405. Plaintiff's gait was normal. R. 405. Dr. Dunkelman also assessed that Plaintiff had left shoulder tendonitis and a cervical/upper back sprain. R. 405. He prescribed physical therapy and continued follow-up with Dr. Handago for medication. R. 405. Dr. Dunkelman determined that Plaintiff had a partial disability with no lifting greater than five to ten pounds and noted that no light duty status was available at her work. R. 405.

Dr. Dunkelman saw Plaintiff almost monthly in 2013 for her complaints of neck and left shoulder pain (Plaintiff rated it anywhere from an 8 to 10 out of 10). R. 380-94, 396-401, 442-87. Dr. Dunkelman consistently noted that Plaintiff had restricted ranges of motion of the left shoulder. R. 380-82, 396, 443, 447, 450, 477. Plaintiff had tenderness and spasm on her neck, upper back muscle, upper trapezius muscles, and at times the left shoulder, normal muscle tone, no atrophy, intermittent numbness and tingling in her left upper extremity, no sensory deficits, symmetrical reflexes and no clonus. R. 380-82, 396, 447, 450, 477. Dr. Dunkelman diagnosed Plaintiff with a neck sprain and calcifying tendinitis of the shoulder in the progress notes and assessed that she had a marked partial disability. R. 443, 447, 450. He prescribed Percocet, Neurontin, Cymbalta and Soma. R. 443, 447, 450. Dr. Dunkelman continued to see Plaintiff

monthly in 2014 and found that she had paracervical spine tenderness/spasm, tenderness and restricted motion of her left shoulder, at times bilaterally. R. 435, 439, 551, 555, 559, 563, 567, 571, 575, 579, 583. Dr. Dunkelman's findings were consistent until April when he noted Plaintiff's decreased sensation to palpation of both hands, R. 555, 559, 563, 567, 571, 579, 575. An April 10, 2014 EMG study was negative for radiculopathy. *See* R. 644.

Dr. Dunkelman routinely completed Workers' Compensation Doctor's Progress Reports, assessing a "75%" temporary impairment and noting that Plaintiff could return to work with limitations of bending/twisting, lifting less than 10 pounds, sitting and standing. R. 383-84, 389-90, 397-98, 400-01, 442, 445-46, 448-49, 475-76, 549-50, 553-54, 557-58, 561-62, 565-66, 569-70, 573-74, 577-78, 581-82.

On October 28, 2014, Dr. Dunkelman completed a Workers' Compensation Maximum Medical Improvement/Permanent Impairment Report and diagnosed Plaintiff with a neck sprain and calcifying tendonitis of the shoulder. R. 643-44. Dr. Dunkelman assessed Plaintiff had cervical spasms and reduced left shoulder range of motion, no muscle atrophy, and noted negative EMG results, cervical MRI showing no herniated nucleus pulposus and a normal MRI of the left shoulder. R. 644.

Dr. Dunkelman opined that Plaintiff could occasionally lift/carry and push/pull less than 10 pounds; frequently sit, stand, walk, and perform simple grasping, and fine manipulation; and occasionally bend, stoop, squat, reach at or below shoulder level, drive, and operate machinery but could not climb, kneel, reach overhead, or tolerate temperature extremes or high humidity. R. 645. In a separate part of the report, Dr. Dunkelman stated that Plaintiff could perform "sedentary work," including exerting up to 10 pounds of force occasionally and sitting most of the time. R. 645. He stated that Plaintiff would benefit from vocational rehabilitation and that

she "can retrain with restrictions above." R. 645.

### 4. Dr. Jeffrey Ritholtz

On October 18, 2012, Dr. Jeffrey C. Ritholtz, a chiropractor, performed a Workers' Compensation independent chiropractic examination and review of Plaintiff's available medical records. R. 273-78. Dr. Ritholtz reported that Plaintiff ambulated without difficulty, but noted she had trouble moving about during the examination. R. 275. Cervical spine testing — Soto Hall, compression, distraction and Valsalva tests — were all negative. R. 275. Plaintiff had full flexion, extension and lateral flexion to the right, but left lateral flexion, and rotation bilaterally were limited in her cervical spine. R. 275. Dr. Ritholtz's testing of Plaintiff's thoracic spine revealed a positive Soto Hall sign. R. 276. Dr. Ritholtz's examination of Plaintiff revealed that Plaintiff had pain on palpation of the right cervical area, and the left upper-mid thoracic area but no muscle spasm in the cervical or thoracic spine. R. 276. Dr. Ritholtz assessed cervical and thoracic sprain/strain and assessed a "partial moderate disability." R. 277. Dr. Ritholtz opined that Plaintiff could return to work full-time on light duty with no lifting, pushing, pulling or carrying over ten pounds.

### 5. Dr. G. Bhanusali

On October 24, 2012, Dr. G. Bhanusali performed a Workers' Compensation independent orthopedic examination of Plaintiff's cervical spine and found no muscle spasm and minimal tenderness, full flexion, extension, and side-bending, but limited side rotation. R. 326. Plaintiff reported pain with compression and distraction tests. R. 326. Dr. Bhanusali's examination revealed that Plaintiff had tenderness of the left shoulder, her range of motion was

limited, and Neer and Hawkins signs[3] were positive. R. 326. By contrast, Plaintiff had no abnormalities of the right shoulder. R. 327. Plaintiff's grip strength of 85 pounds in her right dominant hand, and 45 pounds in her left hand. R. 327. Plaintiff had mild tenderness and no muscle spasm in her thoracic spine. R. 326-27. Dr. Bhanusali assessed overuse syndrome and possible impingement syndrome in the left shoulder, and partial moderate temporary disability because Plaintiff could do modified work without lifting any weight with the left hand and avoiding overhead activities with the left shoulder, pending reevaluation in three months. R. 327-28. On January 24, 2013, Dr. Bhanusali evaluated Plaintiff and found that Plaintiff had mild tenderness and no muscle spasm, limited ranges of motion with complaints of pain, tenderness and limitation of motion in her left shoulder, no abnormalities of the right shoulder and positive Neer and Hawkins signs on the left side. R. 322. Plaintiff had grip strength of 65 pounds in her right dominant hand and 30 pounds in her left hand. R. 322. Dr. Bhanusali diagnosed Plaintiff with overuse syndrome of the left shoulder and the cervical and thoracic spine but noted that Plaintiff showed signs of symptom magnification on the present examination. R. 323. Dr. Bhanusali ultimately determined that Plaintiff had a moderate temporary disability and opined that Plaintiff could do modified work with no lifting of more than five pounds with her left hand and avoiding overhead activities with her left shoulder. R. 323.

### 6. Dr. David Jaeger

On April 16, 2013, Dr. David A. Jaeger, a neurologist, evaluated Plaintiff's neck and back pain. R. 377-80. Dr. Jaeger noted an August 31, 2012 thoracic MRI report of disc bulges

---

[3]   The Neer and Hawkins tests are commonly used to identify possible subacromial impingement syndrome. Nick Phillips, "Tests for diagnosing subacromial impingement syndrome and rotator cuff disease," (June 17, 2014). Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4935057/

without neural impingement and a September 26, 2012 cervical MRI report of disc bulges, with no herniated nucleus pulposus, central canal stenosis or neural foraminal stenosis (narrowing). R. 377. Dr. Jaeger found that the muscles on the left side of Plaintiff's neck, especially the trapezius, were very tender and tight, and that she could not turn her head to the right. R. 379. Dr. Jaeger found that Plaintiff's motor functions and reflexes were normal but she had allodynia (pain from stimuli that does not normally cause pain) to touch of the left posterior neck and some paresthesias with Tinel's sign (irritated nerves). R. 379. There was no clear focal weakness in her arms. R. 379. Plaintiff had significantly increased muscle tone of the left trapezius. R. 379. Dr. Jaeger assessed cervical dystonia and carpal tunnel syndrome. He recommended that Plaintiff get an EMG/NCS to evaluate the symptoms in Plaintiff's left arm, and a consultation with Dr. Faskowitz for possible trigger point or Botox injection for the cervical dystonia. R. 379.

### 7. Dr. Andrew Faskowitz

On May 16, 2013, Dr. Andrew Faskowitz evaluated Plaintiff at the referral of Dr. Jaeger and noted Plaintiff's normal upper extremities and found she had severe cervical torticollis[4] on her left side. R. 374. Dr. Faskowitz recommended Botox injections for her cervical torticollis. R. 375.

### 8. Consultative Examiner, Dr. Ted Woods

On August 21, 2013, Dr. Ted Woods conducted a consultative internal medicine examination at the request of the SSA. R. 406-09. Dr. Woods noted that Plaintiff guarded her left arm throughout the physical examination, but otherwise moved around freely. R. 407. Dr.

---

[4]        Cervical torticollis is a condition in which your neck muscles contract involuntarily, causing your head to twist or turn to one side. Mayo Clinic Staff, "Cervical dystonia," (Nov. 17, 2017). Available at https://www.mayoclinic.org/diseases-conditions/cervical-dystonia/symptoms-causes/syc-20354123.

Woods noted her gait and stance were normal but that she had limited and painful ranges of motion of the cervical spine, paracervical tenderness to touch, limited range of motion of the left shoulder and tenderness to touch, no muscle atrophy evident in Plaintiff's extremities. R. 408. Plaintiff's hand and finger dexterity was intact and grip strength was four out of five on the left and five out of five on the right. R. 408. Dr. Woods diagnosed Plaintiff with left shoulder, neck, and mid-back pain. R. 409. He opined that Plaintiff had a moderate limitation for pushing, pulling, lifting, and carrying heavy objects with her left arm, and a moderate limitation for handling objects with her left hand. R. 409.

### 9. Dr. Shanker Krishnamurthy

On December 16, 2013, Dr. Shanker Krishnamurthy, an orthopedic surgeon, examined Plaintiff for a Workers' Compensation independent medical examination. R. 625-31. Dr. Krishnamurthy noted that Plaintiff walked with a slow gait, but did not use an assistive device. R. 627. Dr. Krishnamurthy also noted that Plaintiff held her neck very stiff when observed, but when unobserved she shook her head in response to questions without appearing to generate any pain. R. 627. Plaintiff complained of pain with any active motion in the cervical spine. R. 627. Dr. Krishnamurthy found that sensation was diminished in Plaintiff's left upper extremity. R. 627. Dr. Krishnamurthy found no objective motor deficits, symmetrical reflexes in her extremities, limited motion of the left arm, and no pain with movement of the lumbar spine. R. 627. Straight leg raising was negative, reflexes were symmetrical, and there was no objective sensory or motor deficits in the lower extremities. R. 628. Dr. Krishnamurthy concluded: "It was difficult to come up with a diagnosis, other than to say that she has cervical dystonia." R. 629. He recommended a neurological evaluation, noting that none of the tests that had been done (including MRIs and NCV studies) shed light on Plaintiff's problem from a physical

standpoint. R. 629. Dr. Krishnamurthy opined that Plaintiff had a marked impairment based on Workers' Compensation guidelines and that Plaintiff could not return to work based on that day's evaluation. R. 629.

### 10. Dr. Marc Berezin

On September 9, 2014, Dr. Marc A. Berezin conducted a Workers' Compensation independent orthopedic examination of Plaintiff and a review of her medical records. R. 636-42. On examination, Plaintiff walked around the office bending over and moving around, did not sit at all, because she was having severe spasms. R. 641. Neck examination revealed cervical tenderness to extremely light touch but no muscle spasm. R. 641. An examination of Plaintiff's upper extremities revealed no atrophy and intact sensation and motor examination. R. 641. Dr. Berezin's examination of Plaintiff's shoulders revealed prominence of the AC joint bilaterally and restricted ranges of motion bilaterally. R. 641. Dr. Berezin's examination of Plaintiff's back revealed extreme thoracic tenderness to light touch and limited ranges of motion. R. 641. Dr. Berezin's examination of Plaintiff's lower extremities revealed no motor or sensory deficit, intact reflexes, negative straight leg raise test, and no atrophy. R. 641. Dr. Berezin diagnosed Plaintiff with cervical and thoracic sprain and left shoulder strain. R. 641. He concluded that, from an orthopedic standpoint, there was no medical necessity for treatment and that Plaintiff's subjective complaints and spasm did not correlate with objective testing performed. R. 641. Instead, Dr. Berezin found that any disability would be related to a possible neurologic condition, rather than an orthopedic condition. R. 641-42. As a result, Dr. Berezin assessed a mild degree of disability from an orthopedic standpoint, and opined that Plaintiff was limited with respect to repetitive lifting and overhead activities. R. 642.

## C. Plaintiff's Hearing Testimony

On January 9, 2015, Plaintiff appeared before the ALJ for her administrative proceeding. R. 35-72. At the time of her hearing, Plaintiff was 44 years old. R. 39. Plaintiff testified that she lives with her husband, her 18 year old niece and her 21 year old daughter. R. 51. Plaintiff testified that in 2003 she worked as a prep cook at TTC Ventures, a before and after school day care program where she picked up kids up to 12 years old, dropped them off, and cooked for them. R. 45-46. From 2007 through 2010, Plaintiff was a food service helper who helped prepared the food for senior citizens, unload trucks, and carry food out to the cars so they could deliver the food to other homes. R. 41. Plaintiff testified that during this period she also worked at Gateway Services part-time for roughly five hours a day cleaning offices, dusting, and taking out garbage. R. 41. During her employment at the County of Orange, Plaintiff was a carrier from 2010 (when her daughter died) through 2012. As a carrier, Plaintiff carried and loaded food, such as hot meals, cold meals and juice to the trucks, and, delivered them to each hours or destination. R. 31. Plaintiff testified that she worked until her injury and stopped working in 2012. R. 39-41, 43. However, Plaintiff admitted that she did not know how her injury first started. R. 43. Plaintiff testified her doctors took MRIs and X-rays to figure out the cause of her neck and back spasms and admitted that the results of that testing did not show any damage. R. 44.

Plaintiff testified that she takes Percocet three times a day and Soma once or twice a day depending on how bad her spasms are, Neurontin three times a day, a Cymbalta and a Concerta. R. 47. Plaintiff testified that she feels pain in her neck, shoulder and mid back during the hearing and all day, every day. R. 48-49. Plaintiff testified that her neck pain is outrageous and a 10 on a scale of 1 to 10, her right hand falls asleep constantly, and her left arm hurts all the time. R.

48. She testified that she cannot move her head to the left or right or up and down more than 5%. R. 50. Plaintiff testified that her medication lessens her pain but does not completely take it away and the shots her doctor gave her to relieve her neck pain did not work. R. 50-51.

Plaintiff testified that her husband ties her shoes, does the laundry, and buys the groceries. R. 52. She testified that she cannot drive, she cannot cook, and she cannot care for her grandson. R. 52. Plaintiff testified that she can sit for three to five minutes before she has to get up and move around, walk from two to ten minutes before she needs to stop, and stand from three to five minutes or more. R. 57-58. Plaintiff explained that the numbness in her fingertips limits her ability to cook, use a computer, or text on her cellphone because it hurts. R. 59. Plaintiff was squatting at the hearing because it eases the spasms and pressure in her back. R. 58. She stopped driving in 2012 because the medication she is taking for the pain makes her drowsy. R. 59.

### D. Vocational Expert

At the administrative hearing, the ALJ obtained the testimony of vocational expert Dawn Blythe to determine whether there were jobs that plaintiff could perform given the ALJ's residual functional capacity and other vocational considerations. R. 62-72. The vocational expert considered Plaintiff's past work as a kitchen helper, 318.687-010, SVP 2, exertional level medium; deliverer outside, 230.663-010, SVP 2, exertional level light; fast food worker, 211.471-010, SVP 2, exertional level light, school bus monitor, 372.667-042, SVP 2, exertional level light; cleaner commercial or institutional, 381.687-014, SVP 2, exertional level heavy; and cook helper, 317.687-010, SVP 2, exertional level medium. R. 62. The ALJ proposed a hypothetical person of claimant's age, education, and work history with the residual functional capacity to engage in a full range of sedentary work as defined in the Dictionary of Occupational

Titles except that the person has the following additional limitations: The person cannot reach overhead with the non-dominant left upper extremity, the person can frequently handle and finger with the left upper extremity, the person can frequently flex, extend, and rotate the neck, the person cannot operate motor vehicles or machinery, the person can occasionally push and pull with the non-dominant left upper extremity, the person cannot climb ladders, kneel, but the person can occasionally stoop, occasionally crouch, and occasionally climb stairs. R. 63. The ALJ asked whether such a person could do any of Plaintiff's past work as actually performed by Plaintiff or as generally performed in the national economy. R. 63. The vocational expert found that Plaintiff would not be able to do her past relevant work. R. 63. However, the vocational expert testified that Plaintiff could perform the work of an order clerk, food and beverage, 209.567-014, SVP 2, exertional level sedentary of which there are 208,800 jobs in the national economy; addresser, 209.587-010, SVP 2, exertional level sedentary, of which there are 96,560 jobs in the national economy; call out operator, 237.367-014, SVP 2, exertional level sedentary, of which there are 51,650 jobs in the national economy; film touch up inspector, 726.684-050, SVP 2, exertional level, sedentary of which there are 454,010 jobs in the national economy. R. 64-65.

Plaintiff's counsel then asked the vocational expert whether the hypothetical person could perform those jobs if also limited to only occasionally using his hands for grasping and occasionally using the hands for fine manipulation. R. 65. In response, the vocational expert testified that under the modified hypothetical, the only job such a person would be able to perform the job of a call out operator or surveillance monitor. Plaintiff's counsel further modified the hypothetical to include the requirement that the person leave the work station for 15 to 20 minutes every 15 or 20 minutes. R. 66. The vocational expert responded that this

limitation would preclude her ability to perform any of the aforementioned jobs. R. 66. Plaintiff's counsel then modified the hypothetical to include the limitation that the person could only lift up to 10 pounds per day and could only occasionally use her hands for fingering and grasping. R. 66. The vocational expert testified that under that hypothetical, she would still be able to work as a surveillance monitor and callout operator. R. 66. The vocational expert also testified that if such a hypothetical person was also in pain 25-50% of the time, such a person would be unable to perform any of the aforementioned jobs. R. 68-69.

## III.  LEGAL STANDARDS

### A.  Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). Rather, the court's review is limited to "determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam).

The substantial evidence standard is "even more" deferential than the 'clearly erroneous' standard. *Brault v. Social Sec. Admin*, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court must defer to the Commissioner's factual findings, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). "Substantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Commissioner of*

*Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotations omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations omitted). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

### B. Statutory Disability

A claimant is disabled under the SSA when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). In addition, a person is eligible for disability benefits under the SSA only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.
> *Id.* § 423(d)(2)(A).

A claimant's eligibility for SSA disability benefits is evaluated pursuant to a five-step sequential analysis:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Rolon v. Commissioner of Soc. Sec.*, 994 F. Supp. 2d 496, 503 (S.D.N.Y. 2014); *see* 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v). The claimant bears the burden of proof as to the first four steps of the process. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). If the claimant proves that his impairment prevents him from performing his past work, the burden shifts to the Commissioner at the fifth and final step. *See id.* At the fifth step, the Commissioner must prove that the claimant is capable of obtaining substantial gainful employment in the national economy. *See Butts v. Barnhart*, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

## IV.     THE ALJ'S DECISION

The ALJ issued a decision on March 12, 2015 following the standard five-step inquiry used for determining disability. R. 14-29. In the first step of the inquiry, the ALJ determined that Plaintiff had not performed substantial gainful activity since the August 6, 2012 alleged onset date. R. 16.

At step two, the ALJ next found that Plaintiff's medical issues — cervical spine strain with disc bulging, thoracic spine disc bulging, left shoulder tendinosis with "overuse syndrome" — rose to the level of "severe" causing "more than minimal functional limitations." R. 16-20.

At step three, further considering the medical severity of Plaintiff's impairments, the ALJ decided that Plaintiff did not meet or medically equal the "Appendix 1" impairments, which compel a finding of disability. R. 20.

At step four, the ALJ considered "the entire record" and made a finding about Plaintiff's residual functional capacity. R. 20. The ALJ found that "the claimant has the residual functional capacity (RFC) to perform a full range of sedentary work as defined in 20 C.F.R. 404.1567(a) except as restricted by the following: the claimant cannot reach overhead with the non-dominant left upper extremity; she can frequently handle and occasionally push/pull with the left upper extremity; she is limited to frequent flexion, extension, and rotation of the neck; she should not climb ladders or kneel and is limited to occasional stooping, crouching, and climbing of stairs the person cannot operate motor vehicles or machinery." R. 20.

In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence…" R. 20. The ALJ also considered Plaintiff's testimony of very serious physical symptoms which would prevent her from performing fulltime work at any level. R. 21.

The ALJ did not find the claimant's testimony credible because the "claimant's allegations of serious symptoms and limitations are not supported by the medical evidence of record." R. 21. On this point, the ALJ concluded that "the objective testing of record is clearly inconsistent with the claimant's complaints regarding her symptoms and limitations." R. 21.

In making the residual functional capacity determination, the ALJ also considered (i) the notes and opinions of an independent chiropractor, Dr. Ritholtz; (ii) a functional capacity evaluation by Herbert Garcia, M.D.; (iii) the notes and opinions of an orthopedic specialist, Dr. Bhansuali; (iv) the notes and opinions of Plaintiff's treating physician, Neal Dunkelman, M.D.; (v) the notes and opinion of Plaintiff's other treating physician, John Handago, M.D.; (vi) the independent physical examination results by Dr. Krishnmirthy, an orthopedic surgeon; (vii) the notes and opinions of Dr. Berezin, an orthopedic specialist; and (viii) the treating notes and opinion of consultative examiner, Dr. Ted Woods. R. 16-20.

After making the above findings, the ALJ considered whether the claimant would be able to perform any past relevant work. R. 27 (citing 20 C.F.R. § 404.1565). The ALJ found that "such work would be precluded given the RFC attributed to claimant here." R. 27.

Following these conclusions, the ALJ reached the end of the five-step process, determined that Plaintiff was not disabled, and denied her application for benefits. R. 28.

## V.    DISCUSSION

Plaintiff argues that the ALJ erred (i) by misapplying the treating physician rule in both his treatment of Dr. Handago's opinion and his treatment of Dr. Dunkelman's opinion, (ii) by failing to support his residual functional capacity determination with substantial evidence. and (iii) by improperly considering Plaintiff's credibility. Defendant contends that the ALJ (i) properly considered both treating physicians' opinions and awarded them less than controlling weight because they conflicted with substantial evidence of record, (ii) properly supported his residual functional capacity determination with substantial evidence; and (iii) properly determined that Plaintiff's alleged disability symptoms were not wholly credible because they were inconsistent with the objective medical evidence.

## A.     The Treating Physician Rule

Plaintiff argues that the ALJ's disability determination is unsupported by substantial evidence because the ALJ violated the treating physician rule by failing to award controlling weight to either of her treating physicians' opinions. P. Mem. at 14. Defendant contends that the ALJ properly awarded less than controlling weight to the opinions of Plaintiff's treating physicians because "[t]he ALJ set forth inconsistences in the record that undermine the reliability" of Plaintiff's opinion. D. Mem. at 16-21.

When considering the medical opinion record evidence, the ALJ must give deference to the opinions of a claimant's treating physicians. A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 416.927(c)(2); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ should consider the following factors to determine the amount of weight the opinion should be given: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area, and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(2)-(6); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). Although the foregoing factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly address each factor. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.")(citing *Halloran v.*

*Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam)). As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

### a. Dr. John Handago, M.D.

Plaintiff asserts that the ALJ should have awarded controlling weight to Dr. Handago's opinions because Dr. Handago routinely examined Plaintiff for several years, Dr. Handago is a specialist in orthopedics, and Dr. Handago's opinions were consistent with the medical record as a whole. P. Mem. at 14. Defendant contends that the ALJ correctly awarded less than controlling weight to Dr. Handago's opinions because they appear to be based solely on subjective symptoms that were unsupported by the objective evidence of record. D. Mem. at 20 (citing R. 26).

Although an ALJ must give deference to the opinions of a claimant's treating physicians, as long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

Here, the ALJ considered several of the factors under 20 C.F.R. § 416.927(c)(2)-(6) before determining what weight to award Dr. Handago's opinions. First, the ALJ considered the length of treatment and frequency of examination, noting that Dr. Handago examined Plaintiff every one to three months and regularly completed disability forms expressing his opinion about Plaintiff's degree of disability. R. 18. Second, the ALJ considered the medical support for the treating physician's opinion and found that Dr. Handago's "disability rating of '100%'" based on an impairment of cervical herniated nucleus pulposis was at odds with 'two separate MRI scans'

that "clearly confirm that the claimant had no herniated discs at any level of the cervical spine," and that Dr. Handago's observations of tenderness and reduced range of motion in Plaintiff's neck and left shoulder were similarly unsupported by Dr. Handago's own clinical reports. R. 18, 22. Third, the ALJ considered the consistency of the opinion with the record evidence, noting (i) Dr. Garcia's two functional evaluations, which showed deficits in Plaintiff's left upper extremity and cervical region resulting only in 12% to 22% overall disability ratings[5]; (ii) Dr. Berezin, an independent medical examiner found that the objective medical evidence did not correlate with the Plaintiff's subjective complaints because Plaintiff was only mildly disabled from an orthopedic standpoint, R. 22 (citing Ex. 22F); (iii) Dr. Krishnamurthy, another independent medical examiner, in December 2013 reported that Plaintiff seemed to hold her neck in a stiff posture when observed but shook her head without apparent discomfort when she believed she was not being observed by the examiner, R. 22 (citing Ex. 20F); and (iv) Dr. Bhanusali, another examining doctor, noted in January 2013 that the Plaintiff's symptoms and behaviors appeared to be "exaggerated" given the generally benign objective medical evidence. R. 22 (citing Ex. 7F). Ultimately, the ALJ awarded "little weight" to Dr. Handago's opinion that Plaintiff was 100% disabled because it was wholly conclusory and lacking any specific limitations about Plaintiff's ability. R. 25.

The ALJ then turned to Dr. Handago's July 2014 medical source statement, which noted Plaintiff's ability to perform sedentary work and lift 10 pounds only occasionally, and awarded it "partial weight," in part, because of the additional detail provided. R. 25 (citing Ex. 21F). The ALJ awarded Dr. Handago's December 2014 medical source statement "little weight" because

---

[5]     Dr. Garcia did indicate on the disability form that Plaintiff was 100% disabled even though it conflicted with his examination reports. R. 21-22.

the ALJ believed it unsupported by medical evidence, far more restrictive than his July 2014 medical source statement, and suggested exertional limitations that would preclude Plaintiff's ability to perform the minimal requirements of sedentary work—Dr. Handago opined that Plaintiff was only capable of lifting 10 pounds or less *rarely* and that she would require frequent changes in position and breaks when sitting, standing, or walking. R. 25-26.

Accordingly, the ALJ provided several "good reasons" for the weight accorded to Dr. Handago's opinion and the ALJ's reasoning was supported by substantial evidence of record.

### b. Dr. Dunkelman

Plaintiff asserts that "the same argument should be made" about the ALJ's treatment of Dr. Dunkelman's opinions and does not elaborate further. P. Mem. at 15. Defendant contends that the ALJ properly awarded "partial weight" to Dr. Dunkelman's opinions because they were inconsistent with objective evidence of record. D. Mem. at 21.

Although an ALJ must give deference to the opinions of a claimant's treating physicians, as long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

Here, the ALJ's analysis of Dr. Dunkelman's opinion considered factors such as the length and nature of Dr. Dunkelman's treatment of Plaintiff but focused on the inconsistencies between Dr. Dunkelman's opinions as compared to Dr. Dunkelman's own clinical findings and other objective medical evidence of record. In particular, the ALJ noted: (i) Dr. Dunkelman's April 2014 notes included reports of decreased sensation in Plaintiff's hands yet Plaintiff's April 2014 EMG, taken in Dr. Dunkelman's office, was negative for any neurological abnormality affecting the upper extremities, R. 18, 21, (ii) Dr. Dunkelman's observations of Plaintiff's

complaints of severe pain in her neck, upper back, and left shoulder, with alleged pain and tingling radiating into the arms/hands and observations of paraspinal tenderness and spasm did not include any findings of sensation abnormality, strength deficit, or gait abnormality, R. 18; (iii) Dr. Dunkelman's diagnosed Plaintiff with a "sprain of neck" and "calcifying tendinitis of the shoulder" but the record contains no imaging confirming calcification in the left shoulder. R. 18 (citing Exs. 11F, 14F, 15F, 18F, 19F).

Ultimately, the ALJ found Dr. Dunkelman's conclusion that Plaintiff had partial, marked disability consistently at 75% (including a specific limitation of a lifting limit of less than 10 pounds and unspecified limitations to sitting, standing, bending/twisting, and climbing stairs or ladders) to be "relatively vague and is not entirely consistent with the evidence." R. 18, 25. As a result, the ALJ awarded Dr. Dunkelman's opinion "little weight." R. 25.

Given that the ALJ provided "good reasons" for the weight accorded to Dr. Dunkelman's opinion, I find the ALJ properly applied the treating physician rule.

## B. Residual Functional Capacity Determination

Plaintiff further argues that the ALJ's residual functional capacity determination is not supported by substantial evidence because he did not award controlling weight to key clinical findings from Dr. Handago and Dr. Dunkleman. P. Mem. at 16. This claim amounts to a restatement of Plaintiff's treating physician argument. Thus, remand is unwarranted for the same reasons discussed above.

Plaintiff also argues that the ALJ erred by ignoring Plaintiff's neck and left upper extremity limitations. P. Mem. 16, 17. This argument fails because the ALJ's residual functional capacity incorporated those very limitations: "claimant has the residual functional capacity (RFC) to perform the full range of sedentary work as defined in 20 C.F.R. 404.1567(a)

except as restricted by the following: *the claimant cannot reach overhead with the non-dominant left upper extremity… she is limited to frequent flexion, extension, and rotation of the neck …"* R. 20. Remand is unwarranted on this basis.

## C. Credibility

Plaintiff attacks the ALJ's analysis of Plaintiff's credibility asserting that it ignores important facts in the record. P. Mem. at 17-18. Defendant argues that the ALJ correctly found that Plaintiff's alleged disability symptoms were not wholly credible because they were inconsistent with the objective medical evidence. D. Mem. at 22.

While it is true that an ALJ is required to consider the plaintiff's reports of pain and other limitations, 20 C.F.R. § 416.929, an ALJ is not required to accept the plaintiff's subjective complaints without question. *McLaughlin v. Sec'y of Health, Educ. & Welfare*, 612 F.2d 701, 704-05 (2d Cir. 1980). In assessing a claimant's subjective claims of pain and other symptoms, the ALJ must first determine whether there are "medically determinable physical or mental impairment(s) — *i.e.*, an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques — that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p.[6] If this has been shown, the ALJ must then

---

[6]      Effective on March 28, 2016, SSR 16-3p, 2016 SSR LEXIS 4 superseded SSR 96-7p, 1996 SSR LEXIS 4. *See* SSR 16-3p, 2016 SSR LEXIS 4 (Mar. 28, 2016). The new ruling eliminates the use of the term "credibility" from the SSA's sub-regulatory policy, in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." 2016 SSR LEXIS 4, at *1. Instead, adjudicators are instructed to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms." 2016 SSR LEXIS 4, at *2. Both the two-step process for evaluating an individual's symptoms and the factors used to evaluate the intensity, persistence and limiting effects of an individual's symptoms remain consistent between the two rulings. *Compare* SSR 96-7p, 1996 SSR LEXIS 4 with SSR 16-3p, 2016 SSR LEXIS 4.

evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine

the extent to which the symptoms limit the individual's ability to do basic work activities. *Id.*

When making a credibility determination, the ALJ can consider the following factors: (1) daily

activities; (2) the location, duration, frequency, and intensity of the pain or other symptoms; (3)

precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any

medication taken to alleviate pain or other symptoms; (5) treatment, other than medication,

received for relief of pain or other symptoms; (6) any measures used to relieve pain or other

symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or

other symptoms. 20 C.F.R. § 416.929(c)(3). An ALJ is not required to explicitly address each

of the regulatory credibility factors. *Cichoki v. Astrue*, 534 Fed. App'x 71, 76 (2d Cir. 2013)

(summary order). If after considering these factors the ALJ's findings "are supported by

substantial evidence... the court must uphold the ALJ's decision to discount plaintiff's subjective

complaints of pain." *Aponte v. Sec'y, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d

Cir. 1984).

    Before making his determination that Plaintiff's allegations of debilitating symptoms

were not wholly credible, the ALJ considered several of the factors listed in 20 C.F.R. §

416.929(c)(3), including, among other things, Plaintiff's daily activities, Plaintiff's treatment

received for relief of pain or other symptoms, and the type, dosage, effectiveness, and side

effects of any medication taken to alleviate pain or other symptoms. R. 27. In reviewing the

type, dosage, effectiveness, and side effects of any medication that Plaintiff took to alleviate pain

and other symptoms, the ALJ noted that Plaintiff's medication prescription would not prevent

---

As the ALJ's decision in this matter was issued before the new regulation went into effect, this
Court reviews the ALJ's credibility assessment under the earlier regulation.

Plaintiff from engaging in the work contemplated by his residual functional capacity finding because the residual functional capacity determination specifically accounted for the side effects of her medication by specifying that she could not drive or work with machinery. R. 26-27. The ALJ also noted Plaintiff's conservative treatment of her allegedly disabling conditions. *Id.* Ultimately, the ALJ focused on the record evidence and found that the lion's share of objective clinical evidence from numerous examiners did not corroborate the severity of Plaintiff's complaints. R. 26. The ALJ found that the record showed "no reasonable explanation for her reported difficulties sitting" because "she did not generally demonstrate significant gait abnormalities," and "no reasonable basis for the claimant's allegations that her pain symptoms are so intense that she is unable to focus/concentrate on or complete event simple mental tasks" because "no cognitive deficits were noted under examination, and the claimant's reported pain levels are not reasonable based on the objective record." R. 27.

In light of the foregoing, the ALJ's credibility determination was supported by substantial evidence. On this record, I decline to disturb the ALJ's credibility finding.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff's motion is **DENIED**, and Defendant's motion is **GRANTED**.

Dated: March 5, 2018
White Plains, New York

SO ORDERED

Paul E. Davison, U.S.M.J.